UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

MITCHELL WALL,                          :
                                        :
            Plaintiff                   :
                                        :
      v.                                :  CIVIL NO. 3:CV-12-2112
                                        :
DR. BRIAN BUSCHMAN, <u>et al.</u>,       :  (Judge Kosik)
                                        :
            Defendants                  :

**<u>MEMORANDUM</u>**

Mitchell Wall ("Plaintiff"), an inmate confined at the United States Penitentiary at

Allenwood, Pennsylvania, files this <u>Bivens</u>[1] civil rights action alleging deliberate

indifference to his medical needs by denying him a lower bunk status. The only remaining

defendant is Dr. Brian Buschman, Medical Officer/Physician at USP-Allenwood.[2]  Presently

pending is Defendant's motion for summary judgment (Doc. 78.)  For the reasons that

follow, the motion will be granted.

**I.      Background**

In addressing a previous motion to dismiss and for summary judgment filed by the

Defendants in this action, the Magistrate Judge set forth the relevant background of this

---

[1] See <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971).  A <u>Bivens</u> action is a judicially created remedy allowing individuals to seek damages for unconstitutional conduct by federal officials and is the federal counterpart to 42 U.S.C. § 1983 claims brought against state officials.

[2] Assistant Health Services Administrator J. Potope and Unit Counselor Neylon were dismissed from this action pursuant to Fed. R. Civ. P. 12(b)(6) on March 31, 2014.  (Doc. 60.)

action, as follows, in her Report and Recommendation of November 7, 2013:

> On August 2, 2011, Plaintiff fractured his back.  (Doc. 1, Compl. ¶ 11).  He was placed in a handicap cell in segregation for two days, and then taken for x-rays and tests.  He then met with a neurosurgeon who recommended continued treatment with a lumbrosacral corset for three months, which Plaintiff states he never received. (Doc. 1, Compl. ¶¶ 12, 13).  Plaintiff was issued a lower bunk permit through October 5, 2011, prescribed medication for the night, provided a wheelchair, switched to a handicapped cell in the Special Housing Unit, and instructed to keep weight bearing to a minimum for the next 24 hours.  (Doc. 28, ¶¶ 11-12).

> In November and December of 2011, Plaintiff alleges he asked Defendants Neylon, Potope, and Buschman for a lower bunk and was denied each time. (Doc. 1, Compl. ¶¶ 16-20).  On January 31, 2012, Plaintiff had a follow-up examination with the neurosurgeon.  The surgeon wrote a slip for a lower bunk. (Doc. 1, Compl. ¶ 22; Doc. 1 at 52).  According to Plaintiff, a prison officer immediately handed the recommendation to Buschman, (Doc. 1, Compl. ¶ 23), and Buschman rejected Plaintiff's request for a lower bunk.  A few days later, Plaintiff asked Defendant Potope for a lower bunk and told him the surgeon recommended a lower bunk.  Potope told Plaintiff he did not qualify for a lower bunk.  (Doc. 1, Compl. ¶ 24).

> According to Defendants, Buschman was not aware of the neurosurgeon's lower bunk recommendation until February 15, 2012.  The surgeon hand wrote the recommendation for the lower bunk on a slip, and typed up an assessment. The typed up assessment did not include the request for the lower bunk.  (Doc. 29, Br. in Supp. at 7).  The lower bunk recommendation was not entered into the system until February 15, 2012, when the report was reviewed by Plaintiff's Physician Assistant.  (Doc. 1, p. 52).  According to Defendants, following any type of consultation, a note is placed in the mailbox of the physician assistant of the inmate.  (Doc. 29, Br. in Supp. at 7-8).  The computer records indicate that a bottom bunk assignment was made on February 15, 2012.  (Doc. 29, Br. in Supp. at 8.)  Plaintiff was issued a Medical Duty Status slip for a lower bunk on February 17, 2012.  (Doc. 29, Br. in Supp. at 9).

> On February 16, 2012, Plaintiff states that he fell and injured his back while climbing down from his upper bunk assignment. (Doc. 1, Compl. ¶ 25.) Plaintiff was transported to a local hospital for six days following the incident and had surgery on his lower back.  (Doc. 1, Compl. ¶ 28-33).  Plaintiff received a lower bunk from February 21, 2012, when he returned to the facility after his back surgery, until September 6, 2012.  On September 6, 2012, Plaintiff requested a bottom bunk assignment from Defendant Buschman and

was told by Defendant Buschman he did not qualify for a lower bunk.  (Doc. 1, Compl. ¶ 39).

(Doc. 53 at 2-3, 11/7/13 Report and Recommendation.)

Following the filing of the complaint by Plaintiff on October 23, 2012, Defendants filed a motion to dismiss and for summary judgment.  On November 11, 2013, the Magistrate Judge issued a Report recommending that the court: (1) grant Defendants' motion to dismiss all Defendants in their official capacities, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(1); (2) grant Defendants' motion to dismiss Defendants Neylon and Potope, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6); and (3) deny Defendants' motion for summary judgment as to Defendant Buschman pursuant to Fed. R. Civ. P. 56.  (Doc. 53.)

In denying the motion for summary judgment, the Magistrate Judge found a material issue of fact to exist with respect to whether Plaintiff's back condition was a serious medical need.  A  genuine issue of material fact was also found to exist as to whether Defendant Buschman knew and disregarded the neurosurgeon's recommendation of lower bunk status on January 31, 2012. (Id. at 13.)

After adopting the above recommendations, Defendant Buschman was directed to file his answer to the complaint.  (Doc. 60).  An answer was submitted on April 21, 2014.  (Doc. 61.)  Following a period of discovery and several enlargements of the scheduling deadlines, Defendant Buschman filed a motion for summary judgment on August 25, 2014.  The motion is ripe for consideration.

## II.    Summary Judgment Standard

To prevail on a motion for summary judgment, the moving party must show that

"there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In making a summary judgment determination, a court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007). "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). The moving party has the burden of showing the absence of a genuine issue of material fact, but the nonmoving party must present affirmative evidence from which a jury might return a verdict in the nonmoving party's favor. Liberty Lobby, 477 U.S. at 256-57, 106 S. Ct. at 2514. It is well-settled that: "[o]ne cannot create an issue of fact merely by ... denying averments ... without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F. App'x 896, 899 (3d Cir. 2007)(citation omitted). "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d

Cir. 1969).  Thus, allegations made without evidentiary support may be disregarded.  Jones v. UPS, 214 F.3d 402, 407 (3d Cir. 2000).  The court's function in deciding a motion for summary judgment is not to make credibility determinations or weigh evidence, but rather, to simply "determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.

## III.    Eighth Amendment Standard

Plaintiff alleges that the denial of a lower bunk status medical slip constitutes deliberate indifference in violation of the Eighth Amendment.  The Eighth Amendment constitutionally protects prisoners against "unnecessary and wanton infliction of pain contrary to contemporary standards of decency."  Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).  "Unnecessary and wanton infliction of pain" may include failure to provide adequate inmate medical care because inmates rely on prison officials to treat their medical conditions.  Estelle v. Gamble, 429 U.S. 97, 103-04, 97 S.Ct. 285, 290-91, 50 L.Ed.2d 251 (1976).  Failure to provide adequate medical care to an inmate may therefore form the basis of an Eighth Amendment claim.  Id.

To establish an Eighth Amendment claim based on failure to provide medical care, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Id., at 106.  A plaintiff must show that he has "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need."  Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003).

A medical need is serious if it "has been diagnosed by a physician as requiring treatment or is ... so obvious that a lay person would easily recognize the necessity for a

doctor's attention." Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987)(citations omitted).

A finding of deliberate indifference must be based on what an official actually knew, rather than what a reasonable person should have known. See Beers-Capitol v. Whetzel, 256 F.3d 120, 131 (3d Cir. 2001). A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994).

Under the Eighth Amendment, only claims of unnecessary and wanton infliction of pain or deliberate indifference to the serious medical needs of a prisoner rise to the level of a constitutional violation. Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004). "To act with deliberate indifference to serious medical needs is to recklessly disregard a substantial risk of serious harm." Giles v. Kearney, 571 F.3d 318, 330 (3d Cir. 2009). Such indifference may be evidenced by an intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury." White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990). Deliberate indifference does not require a showing of complete failure to provide care, rather, "[w]here prison authorities deny reasonable requests for medical treatment... and such denial

exposes the inmate 'to undue suffering or the threat of tangible residual injury,' deliberate indifference is manifest." Lanzaro, 834 F.2d at 346 (citing Westlake v. Lucas, 537 F.2d 857, 860 (6th Cir. 1976)).  "Needless suffering resulting from the denial of simple medical care, which does not serve any penological purpose ... violates the Eighth Amendment." Atkinson v. Taylor, 316 F.3d 257, 266 (3d Cir. 2003).

An inmate's mere disagreement with medical professionals "as to the proper medical treatment" of his medical complaint does not support an Eighth Amendment violation.  See Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004).  A claim that a doctor or medical department was negligent does not rise to the level of an Eighth Amendment violation simply because the patient is a prisoner.  Estelle, 429 U.S. at 106; see also Singletary v. Pa. Dep't of Corr., 266 F.3d 186, 192 n. 2 (3d Cir 2002)(claims of medical malpractice, absent evidence of a culpable state of mind, do not constitute deliberate indifference under the Eighth Amendment).  Accordingly, a "medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment, at most it is medical malpractice." Id. at 107. "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990).

## IV.   Discussion

### 1.    Undisputed Facts

In moving for summary judgment, Defendant submits a Statement of Material Facts supported by evidentiary materials that include the declarations made under penalty of perjury by J. Bennett-Meehan, Physician's Assistant; Michael S. Romano, Attorney Advisor

at USP-Lewisburg; Defendant Buschman; and T. Stugart, Correctional Account Coordinator assigned to FCC Allenwood. Attached to the declarations are supporting records.  (Docs. 81, 81-1.)

In response thereto, Plaintiff submits a document which consists of two parts.  The first is entitled "Statement of Material Facts" and consists of twenty-one paragraphs (Doc. 87 at 1-3).  The second portion of the document is entitled "Objections to Defendant's Statement of Material Facts Which Are In Dispute" and sets forth objections to specific paragraphs contained in Defendants' Statement of Material Facts (Id. at 4-7).  Attached to Plaintiff's submission are his declaration made under penalty of perjury, medical records, copies of correspondence, discovery requests and responses thereto, inmate requests and administrative remedy filings, and a 2012 BOP Memorandum addressing the issue of Lower Bunk Criteria. (Docs. 87-1, 87-2.)  In response to Plaintiff's filing, Defendant has filed a counter statement of material facts, supported by a second declaration of Defendant Buschman.  (Docs. 88, 88-1.)

Although Plaintiff's opposing statement does not correspond paragraph by paragraph to the statement submitted by Defendant, in the interest of justice to this pro se litigant, the court will set forth the undisputed facts as supported by the parties in their submissions.  Any disputed facts will also be noted.

 Plaintiff sustained a back injury in August 2011 wherein he suffered a fracture of the L2 vertebra.  (Doc. 81-1 at 61, Rajjoub Report.)  He was seen by a neurosurgeon outside the prison who advised non-surgical and other recommended treatment for his injury. Thereafter, Plaintiff was seen by medical providers at the prison between August 2011 and February

2012, and evaluated by his mid-level provider, J. Bennett-Meehan, Physician Assistant.  His mid-level provider made the determination whether Plaintiff's medical condition warranted issuance of a lower bunk pass.  (Doc. 88-1, Buschman Decl. ¶10.)  He was issued a lower bunk pass that expired on October 5, 2011.  (Doc. Doc. 28-2 at 14.)

Defendant does not dispute that a back injury can be serious, but contends each injury must be evaluated and treated on a case by case basis.  (Id. ¶20.)  Between the date of Plaintiff's injury and February 16, 2012, he complained on several occasions of pain.  (Doc. 88-1 at 3.)  He was treated on each occasion, and offered pain medications.  (Doc. 88-1 at 3.) At one point, Plaintiff was denied a specific medication based on his history of substance abuse and circumventing pill line procedures.  (Doc. 87-1 at 20-21, 32.)  He was offered alternative medications used in the community for the same medical indication.  Plaintiff was denied a lower bunk during this time period.  Plaintiff contends it was because he did not meet certain criteria that existed including conditions such as a missing limb, diabetes, or seizures.  Defendant states that the determination was made on a case by case basis at that time, exercising sound clinical judgment, and that Plaintiff's condition did not warrant a lower bunk.  (Doc. 88-1 at 3-4.)

Plaintiff contends that Defendant denied him a lower bunk many times from October of 2011 through February of 2012.  However, Defendant states that Plaintiff was seen by his assigned mid-level medical provider during this time between October of 2011 and February of 2012.  His mid-level provider made the determination as to whether Plaintiff's condition warranted the issuance of a lower bunk pass.  Plaintiff was issued a lower bunk slip following his injury in August of 2011, when it was clinically appropriate/necessary as

determined by his mid-level primary care provider.  (<u>Id</u>. at 4.)

Plaintiff contends that following his injury in August of 2011, the need for a lower bunk was always present and that this was confirmed when he went to his follow up visit with the neurologist Dr. Rajjoub, who at that time recommended lower bunk status. Defendant disputes this statement claiming that Rajjoub's recommendation on January 31, 2012 does not indicate that a lower bunk assignment was necessary going forward from August of 2011.  Plaintiff states that between October 5, 2011 until January 31, 2012, there were no MRI's, CAT scans, or other test's conducted to determine is he was in need of a lower bunk, and that Defendant denied him a needed medication for a year.  In addition, Dr. Rajjoub's report listed an aggravating factor of Plaintiff's pain as climbing up to the second bunk.  (Doc. 81-1 at 6.)

In January/February, 2012, Bennett-Meehan was assigned as the Primary Care Provider for Plaintiff at the prison.  (Doc. 81-1 at 2, Bennett-Meehan Decl. ¶ 2.)  Plaintiff was taken out for his appointment with Dr. Rajjoub at 11:48 a.m. on January 31, 2012.  A BOP consultation form is sent with an inmate to the appointment in order for the physician to write notes for its return to the institution.  There are times when the consult physician does not send the form back with the inmate, but rather returns it to the institution at a later time via fax or email.  There are also times when the form is kept by the escorting officers and returned to the health services department within a few days.  If the officers return the consult form to the health services department, it is placed in the mailbox of the primary care providers (usually a physician assistant) to address.  (Doc. 88-1 at 2.)

Plaintiff returned to USP Allenwood at 3:01 p.m. that afternoon.  (Doc. 81-1 at 32.)

The schedule for January 31, 2012 reveals that there were no physician assistants working after 3 p.m. on said date.  Plaintiff states that PA Bennett-Meehan was in training from January 31, 2012 until February 15, 2012, and that during those 16 days, there were no replacements for her.  Records indicate that Defendant Buschman had an appointment with another inmate that started at 2:48 p.m. and lasted until 3:17 p.m.  (Doc. 81-1 at 35, 38-40.)

On February 13, 2012, at 1:23 p.m., a six-page report of the January 31, 2012 appointment with Dr. Rajjoub was received at USP Allenwood via fax.  The report summarized the January 31, 2012 consultation and recommended an MRI for Plaintiff and a follow-up appointment with Rajjoub after the MRI results were returned.  Approximately one hour after receiving the faxed typed report, Correctional Account Coordinator T. Stugart forwarded the report, via  electronic mail (email), to PA Bennett-Meehan, who was assigned as Plaintiff's primary care provider.  Defendant Buschman was copied on this email.  (Doc. 81 at 3, ¶¶ 7-9; Doc. 81-1 at 54-55, 58.)

The properties of the email reflect that PA Bennett-Meehan opened the message on February 15, 2012, at 7:57 a.m.  (Id. at 58.)  Upon doing so, she printed out Dr. Rajjoub's report, stamped each page with her name and job title, and hand wrote the date (February 15, 2012) on it.  She placed a copy of the report in Defendant Buschman's box at the end of the day on February 15, 2012.

Also on February 15, 2012, PA Bennett-Meehan received a hand written note (written on a BOP Health Services Consultation Request form) from Dr. Rajjoub recommending that Plaintiff be assigned to a bottom bunk.  Bennett-Meehan stamped the consultation form with her name and position title and handwrote the date (February 15, 2012) on it.  At the end of

the day on February 15, 2012, Bennett-Meehan placed the record into Defendant Buschman's mailbox.  (Doc. 81-1 at 2-3.)

The properties of Ms. Stugart's email reflect that Defendant Buschman opened the email message containing Dr. Rajjoub's faxed typed report on February 16, 2012, at 3:36 p.m.  (Doc. 81-1 at 58.)  A printed version was received from PA Bennett-Meehan on February 17, 2012.  Buschman stamped the document after receiving it with his name, job title, and wrote his initials on it.  (Doc. 81-1 at 36.) This report did not contain a recommendation for a lower bunk assignment or anything of an urgent nature.  Absent an urgent issue, Buschman relies on the mid-level primary care providers who see their assigned inmates regularly, to do their job and take appropriate action based on the consultant's report and their knowledge of the inmate's medical condition.

Plaintiff requested a lower bunk assignment from Buschman prior to when the records from Dr. Rajjoub's office were received by him.  Plaintiff was advised the records from Dr. Rajjoub's office would need to be reviewed prior to making a determination of whether a lower bunk assignment was appropriate.  (Doc. 88-1at 3.)

According to Plaintiff, the handwritten note of Dr. Rajjoub on the BOP Consultation Form recommending a lower bunk was reviewed by Defendant Buschman upon his return to USP Allenwood.  Although Buschman was in an appointment with another inmate, the form was handed to him by the officer who escorted Plaintiff back to the prison during his appointment with inmate Luke Jones, in front of both Jones and Plaintiff.  (Doc. 87, Pl.'s Decl. ¶ 4.)  Plaintiff believes that Buschman determined the matter to be non-urgent and then placed the form in the mailbox of PA Bennett-Meehan, who was away at training, and would

not see it for two weeks.  There is no documentary support in the record for this belief.

According to Plaintiff, Defendant looked at the form and told him that he did not qualify for

a lower bunk.

On February 16, 2012, at 7:45 p.m., Plaintiff was seen on his housing unit by an

Emergency Medical Technician ("EMT").  Plaintiff told the EMT that he fell while climbing

down out of his bunk.  The assessment note indicated that Plaintiff was placed on a stretcher

and carried off the unit.  (Doc. 81-1 at 3, 14.)

Defendant Buschman was contacted by phone and ordered medication and that an IV

be started.  He further ordered that Plaintiff be transported to a local hospital for x-rays and

further evaluation.  Buschman co-signed the record the following day (February 17, 2012).

(Id.)

On February 17, 2012, Buschman received the handwritten note of Dr. Rajjoub from

PA Bennett-Meehan recommending that Plaintiff be assigned a lower bunk.  (Doc. 81 at 6;

Doc. 81-1 at 36, 53.) The handwritten record of Dr. Rajjoub was stamped with PA Bennett-

Meehan's name and position title and her handwritten date of February 15, 2012 (the date she

received it).  Buschman stamped Dr. Rajjoub's handwritten record with his name and title on

February 17, 2012.  (Id.)

   2.   Analysis

   *Period from August 2011 to January 31, 2012*

Having considered the submissions of the parties, the court first finds that Defendant

is entitled to summary judgment with respect to Plaintiff's claim that Dr. Buschman was

deliberately indifferent to his medical needs during the period of time from August of 2011

until he went out for his appointment with the neurosurgeon on January 31, 2012.  The

undisputed record fully supports Plaintiff's continuous treatment for his back condition, as

documented by his trips to sick call, where he was seen by various physician assistants, and

on at least one occasion during this time period, by Defendant Buschman.  Absent an urgent

issue, Buschman relies on the mid-level primary care providers who see their assigned

inmates regularly and address their medical needs. The primary care provider who saw

Plaintiff on numerous occasions during the relevant time frame addressed his medical needs.

Defendant's only role in such instances was to review the entries made by the provider and

co-sign the entries.  Defendant would have only looked further into an entry/treatment if

something in the entry was red flagged.  (Doc. 87-2 at 3.)

The record shows that following his back injury on August 2, 2011, Defendant

authorized Plaintiff's outside consult with the neurosurgeon.  The neurosurgeon

recommended conservative treatment with no surgery at this time, but including a back brace

for three months and a follow up visit.  There was no recommendation that Plaintiff be

placed on lower bunk status, and the specialist noted that he could go up stairs.  (Doc. 87-1 at

8.)  Upon Plaintiff's return to the prison, he was seen numerous times with respect to

complaints of pain and provided with medication, including Gabapentin.  (Doc. 87-1 at 19-

20.)  He was also issued a wheelchair and given a lower bunk pass with an expiration date of

October 5, 2011.

Although Plaintiff claims that he requested the extension of the lower bunk status

from Defendant in November and December of 2011 due to pain, the medical records fail to

reveal that he brought up any concerns about the bunk issue in his sick call visits.  (Doc. 1 at

52, 54; Doc. 87-1 at 1-3, 16–17.)  In fact, he only raised the issue of extending the wheelchair

authorization period and use of the back brace.  On December 28, 2011, Defendant examined

Plaintiff at his chronic care appointment.  Plaintiff did complain of back pain and requested

that his medication be changed.  Although Defendant offered to change the medication from

Gabapentin to Elavil or Pamalor, Plaintiff declined.  No request for a lower bunk was made

at this time.  (Doc. 87-1 at 5, 13, 17.)  Based on the foregoing, Plaintiff's treatment record

belies his claim that Defendant did not provide treatment for his back condition during this

time period.  There are no disputed facts in the record creating an issue for trial with respect

to any improper denial of  a bottom bunk from October 5, 2011 through January 31, 2012,

when Plaintiff went to see the outside neurologist. Moreover, based upon the record, any

such  failure on Buschman's part to extend Plaintiff's bottom bunk status would be

negligence at best.

*Period following neurologist appointment on January 31, 2012*

On January 31, 2012, Plaintiff was taken to the neurologist for his follow-up visit.

The neurologist found that Plaintiff had a compression fracture of the L2 vertebra and related

back pain.  The neurologist's typed full report on the appointment was faxed to the prison on

February 13, 2012.  In this report, there was no recommendation that Plaintiff receive lower

bunk authorization. At this time, it was received by Correctional Account Coordinator T.

Stugart and forwarded via email to PA Bennett-Meehan.  Defendant Buschman was copied

on the email.  Record evidence reveals that the email was not opened by Buschman until

February 16, 2012 at 3:36 p.m. (Doc. 81-1 at 43.)  Meehan-Bennett opened the email on

February 15, 2012, and also placed a hard copy of the same in Defendant's box at the end of

that day.  Defendant stamped the report received on February 17, 2012, the day after Plaintiff's fall from his upper bunk.

Although a lower bunk recommendation was not contained in the neurologist's six-page report regarding Plaintiff's appointment which was faxed to the prison on February 13, 2012, a handwritten recommendation was made by him on the "BOP Health Services Consultation Request" form that accompanied Plaintiff to his appointment on January 12, 2012.  There exists disputed facts with respect to when Defendant became aware of the lower bunk recommendation contained in this form.

In his response to Plaintiff's interrogatory questions, Defendant states that upon Plaintiff's return to the prison from his appointment, he was seeing another patient.  He states that he first became aware of the recommendation for a lower bunk on February 17, 2012. (Doc. 87-2 at 17.)  However, he also acknowledges that Plaintiff did talk with him "in passing" about his appointment with the neurosurgeon, and that he requested a lower bunk at that time.  In response, Defendant advised Plaintiff that he had not received the records from the neurosurgeon with respect to his appointment, and that he could not make a determination with respect to a lower bunk until he received and reviewed the records.  (Doc. 87-2 at 27; Doc. 88-1 at ¶ 7.)

Plaintiff maintains that upon his return to the prison from his appointment on January 31, 2012, his escorting officer gave Defendant the consultation form, in the presence of Plaintiff and another inmate.  At the time, Defendant was in an appointment with the other inmate, who witnessed the exchange, as well as Defendant's denial of Plaintiff's request for a lower bunk based upon the recommendation of the neurosurgeon.

16

Not only are these versions at odds, but in the record, Defendant does at least admit to having a conversation with Plaintiff about the lower bunk recommendation at some point following his appointment with the neurosurgeon, and prior to Defendant reviewing the records.  It is not clear when this occurred.  However, even assuming Dr. Buschman was advised of the neurosurgeon's recommendation of a lower bunk on January 31, 2012, in light of the undisputed facts in the record, the entry of summary judgment in favor of Defendant Buschman is not precluded for the following reasons.

The Third Circuit has held that "no [Eighth Amendment] claim is stated when a doctor disagrees with the professional judgment of another doctor." White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990); DeFranco v. Wolfe, 387 F. App'x 147, 158 (3d Cir. 2010)("disagreement of professional opinion among doctors does not equal deliberate indifference"); see also Sawyer v. Sigler, 320 F.Supp. 690, 698 (D. Neb. 1970), aff'd, 445 F.2d 818 (8th Cir. 1971)("While the opinion of a specialist might be highly desirable, this court must leave to the prison physicians the exercise of good judgment regarding medical treatment.").  "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990).

Here, even though there exist facts in dispute as to when Defendant became aware of the neurosurgeon's recommendation that Plaintiff be provided a lower bunk, whether it was on January 31, 2012, when Plaintiff returned from the appointment, or at some other point prior to when the lower bunk pass was issued just over two weeks later, this is not a material issue of disputed fact.  Merely being advised by Plaintiff, upon his return or shortly

thereafter, that a lower bunk was recommended, does not necessarily establish that Defendant was deliberately indifferent to Plaintiff's serious medical needs.  The deliberate indifference standard affords considerable deference to prison doctors in the diagnosis and treatment of medical problems of inmates.  See Inmates of Allegheny Cnty. Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979).  It was within Defendant's exercise of professional judgment to wait until he received and reviewed a copy of the neurosurgeon's full report prior to making any decision to follow the recommendation of the neurosurgeon on the consultation form.

The undisputed facts show that the full report from the neurosurgeon was emailed to Defendant on February 13, 2012, and that the email was opened by Defendant on February 16, 2012, at 3:36 p.m.  A hard copy of the report was placed in Defendant's prison mailbox at the end of the day February 15, 2012, but not stamped received by Defendant until February 17, 2012.  Plaintiff fell from his upper bunk on the evening of February 16, 2012.

While it can be argued that Defendant should have opened his email some time sooner than three days after it was sent, or that he should have picked up the mail from his prison mailbox sooner than two days after it was placed there, any failure to do so would establish negligence at best on Defendant's part, and not the sufficiently culpable state of mind, knowing of and disregarding an excessive risk to Plaintiff health, as is required by the Eighth Amendment.  As previously stated, a claim that a doctor was negligent does not rise to the level of an Eighth Amendment violation simply because the patient is a prisoner. Estelle, 429 U.S. at 106; Singletary, 266 F.3d at 192 n. 2.  Plaintiff fails to carry his burden in opposing Defendant's motion for summary judgment by coming forward with evidence demonstrating a callous disregard for his health on the part of Defendant.

18

In addition, the undisputed record evidence shows that on February 15, 2012, an entry for a bottom bunk assignment was entered in SENTRY Inmate Medical Duty Status, the BOP computer record keeping system.  The entry was effective as of February 15, 2012, the day prior to Plaintiff's fall.  (Doc. 28-2 at 14.)  The lower bunk status is reflected as starting on February 15, 2012, and expiring on August 21, 2012.  A  Medical Duty Status Slip for a lower bunk assignment was issued to Plaintiff on February 17, 2012 by Physician Assistant Bennett-Meehan.  The slip documents that Plaintiff was placed back on bottom bunk status on February 15, 2012, the day before his fall. (Doc. 28-2 at 22, Medical Duty Status Slip; Doc. 87-1 at 18 .)  For these reasons, the court finds that summary judgment is warranted in favor of Defendant with respect to Plaintiff's claim of deliberate indifference for disregarding the neurosurgeon's recommendation on January 31, 2012.

The court further finds that the record fails to support any claim of deliberate indifference to a serious medical need by Defendant following Plaintiff's fall on February 16, 2012.  The undisputed evidentiary materials submitted reveal that both before and after his fall, Plaintiff was provided medication for his back pain.  Following the fall, he was given shots of Ketoralac and Toradol, and transported to an outside provider for x-rays. Buschman cosigned this entry on February 17, 2012.  Plaintiff was hospitalized on February 16, 2012, where he remained until February 21, 2012. (Doc. 87-1, ¶¶ 20-21.)  Upon his return to the prison, he had bottom bunk authorization in place and documented to extend until August 17, 2012.  (Doc. 1 at 45.)

Buschman mainly acted in the capacity of co-signing the medical record for mid-level providers, but did have several encounters with Plaintiff with respect to complaints of back

pain.  On March 13, 2012, Defendant prescribed Tylenol with Codeine.  While Plaintiff was still on lower bunk status at this time, he requested a copy of the lower bunk policy and Defendant explained the policy to him.  (Doc. 87-1 at 20.)  On March 23, 2012, while walking through the hallway, Plaintiff expressed complaints of back pain.  Defendant told him to sign up for sick call and reminded Plaintiff that he had a follow up appointment coming up with the neurosurgeon.  (Id.)  On June 18, 2012, Defendant saw Plaintiff for his Chronic Care Clinic.  When Plaintiff stated that he was having pain in his lower back and that the Gabapentin improved the pain radiating to his legs, Defendant adjusted his medications and ordered lab tests. (Id.)  On November 19, 2012, Plaintiff was again seen for his Chronic Care Clinic and requested stronger medication for his back pain.  Defendant informed Plaintiff that he was not comfortable increasing his pain medication to an opiate due to Plaintiff's past history of substance abuse.  However, his prescriptions were adjusted and physical therapy was recommended.  (Id. at 20-21; Doc. 87-1 at 32.)  These are the only documented encounters by Buschman with Plaintiff.

The record does reflect that Plaintiff wrote to Buschman on September 6, 2012, seeking an extension of lower bunk status. (Doc. 87-1 at 4.)  In support thereof, he cited to his persistent back pain, as well as his previous medical history, including hernia and knee operations and carpal tunnel syndrome problems.  He had been seen in medical by the physician assistant with respect to complaints related to an abdominal aortic aneurysm ("AAA").  Buschman had advised the mid-level provider that AAA was not a condition that warranted a bottom bunk pass.  Buschman also responded to Plaintiff directly informing him that a decision is no longer made locally as to who does and does not qualify for a bottom

bunk, but rather is guided by the Central Office if a person meets the criteria, and that Plaintiff did not meet the criteria.  (Id. at 10.)

The BOP circulated a Memorandum on June 5, 2012 to Clinical Directors and Health Service Administrators setting forth specific criteria to be considered in an effort to standardize lower bunk assignments throughout the Bureau of Prisons.  (Doc. 87-1 at 65-67.) Although the list provides a list of 20 conditions, the memo states that said conditions do not mean automatic qualification, and that medical evaluation and documentation must support the listed criteria.  This criteria does not support that Plaintiff was inappropriately denied lower bunk status in response to his September 6, 2012 request.

Further, Plaintiff takes issue with the fact that his medication Gabapentin was stopped by Defendant Buschman in late May of 2013.  However, the record fully supports that this was done because Plaintiff attempted to circumvent pill line procedures by not swallowing his entire dose.  Although Gabapentin may have been stopped at this point, Plaintiff was put on different medications and not denied treatment.  (Doc. 87-1 at 34-35, 37-40, 48.)

The foregoing undisputed facts demonstrate that Defendant was not deliberately indifferent to Plaintiff's medical needs.  The record demonstrates that Plaintiff was provided treatment, including medications and tests, for his complaints.  While Plaintiff may have disagreed with the treatment received, mere disagreement does not state a claim under the Eighth Amendment.  See Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004).  Accordingly, summary judgment will be granted in favor of Defendant on all remaining claims.  An appropriate order follows.